IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2015

## STATE OF TENNESSEE v. LEMONIQUE SCHEROD JOHNSON

**Direct Appeal from the Circuit Court for Maury County**
**No. 22055      Stella Hargrove, Judge**

_____

**No. M2015-00595-CCA-R3-CD – Filed July 6, 2016**

_____

A Maury County Circuit Court Jury convicted the Appellant, Lemonique Scherod Johnson, of facilitation of aggravated robbery. The trial court sentenced the Appellant as a Range III, persistent offender to twelve years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, contending that the alleged victim was a participant in the robbery, that the evidence did not support a conviction of facilitation aggravated robbery because the victim was not "in fear," and that the Appellant was not involved in the robbery. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Jacob J. Hubbell, Columbia, Tennessee, for the Appellant, Lemonique Scherod Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Brent A. Cooper, District Attorney General; and Kyle E. Dodd, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
## I.  Factual Background

The Appellant's charges relate to the May 20, 2012 robbery of the Tobacco and Beer Store located on Hampshire Pike in Columbia. At trial, Lorenzo Corr testified that on the day of the robbery, he had been working at the store for approximately one month.

Corr opened the store that morning and worked throughout the day. The owner of the store also was at the store that day but left occasionally to run errands for the business.

In the afternoon, the Appellant, whom Corr knew as "Money," came into the store. Some customers were inside the store at that time, and other customers were outside at the store's drive-through window. The Appellant expressed interest in buying a carton of "roll-your-own" cigarettes but left after approximately ten minutes without buying anything. He returned shortly thereafter and asked to use the store's restroom. The restroom was not open to the public, but because the Appellant was a regular customer, Corr gave the Appellant permission and directed him to the back of the store. Corr explained that the front of the store was separated from the back area by a door. In the back area, the first door on the left led to an office, and the second door on the left led to the restroom. On the right side of the hallway were boxes of merchandise. The back door of the store was located at the end of the hall. Corr said that the back door locked when it closed, that it could be opened from the outside only with a key, but that no key was needed to unlock the door from the inside.

Corr said the Appellant was in the back of the store for "a while." When the Appellant returned to the front of the store, he again asked about cigarettes but said he had to talk to his girlfriend before buying anything. The Appellant left the store but soon returned. He asked for and received Corr's permission to use the restroom again. When the Appellant returned to the front area of the store, the other customers were gone. The Appellant talked on his cellular telephone then sat and talked with Corr. Corr thought that the Appellant was "act[ing] kind of weird."

From Corr's position behind the register, he saw a man, who later was identified as Christopher Kinzer, enter the store from the back area. Kinzer had a cloth or shirt wrapped around his face and was wearing a different shirt. Kinzer lifted the shirt and pulled out a long revolver. He walked up to Corr, pointed the gun at him, and demanded the money. Corr was frightened by the gun. He tried to activate the store's silent alarm then opened two of the store's three cash registers. Kinzer removed the cash from the registers and asked Corr about the store's safe. Kinzer said that the store did not have a safe but that a "lotto safe" was in the office; the lotto safe was a "little thing that looked like a safe," and it contained lottery tickets but no money. Corr led Kinzer to the office where the lotto safe was located, opened the lotto safe, and handed Kinzer the cloth bank deposit bag from the lotto safe. Kinzer put the cash from the registers in the bag, took the unactivated lottery tickets from the lotto safe, then walked to the front of the store where the Appellant had remained. Even though Kinzer never spoke to the Appellant, the Appellant screamed and threw his wallet, cellular telephone, and car keys on the floor. Kinzer picked up the car keys and ran out the back door.

Corr said that after Kinzer left, he noticed that the silent alarm had not activated and hit the button again. Corr told the Appellant to leave the store "because [he] had a feeling something wasn't right." The Appellant picked up his wallet and cellular telephone, unlocked the deadbolt on the front door, and ran away. Corr said that during the incident, he did not see when the front door was locked. Corr asked a woman who was outside at the drive-through window to call the police, and they arrived about five minutes later. Corr estimated that Kinzer took between $1,500 and $2,500 in cash from the store.

Corr recalled that at the beginning of the robbery, Kinzer pointed the gun at him and said, "'Come up off it.'" The Appellant screamed, and Corr raised his hands and told Kinzer that he could have whatever he wanted. Corr said that Kinzer never pointed the gun at the Appellant.

Corr said that he told the police about the store's video security system. He was not familiar with the system but knew the password from watching the owner. Corr said that he showed the police the security video because he wanted to convince them that he was not involved in the robbery. While the officer was present, Corr tried to copy the video onto a "thumb drive" but inadvertently erased the video.

Corr asserted that neither he nor Kimberly Duggar had anything to do with the robbery, that he did not know about the robbery before it occurred, and that he had never been charged with a criminal offense associated with the robbery. He said that he told the police everything he knew about the robbery. Corr acknowledged that at the time of trial, he was incarcerated for a felony that was not related to the robbery.

On cross-examination, Corr said that Duggar did not work on the day of the robbery but that she came to the store to help when he was "backed up" and that sometimes they "hung out at the store." He initially denied calling Duggar and asking her to restock lottery tickets on the day of the robbery but later conceded she could have been at the store for that reason. Corr said that prior to the robbery, they kept the door to the office unlocked. The owner and Duggar had keys to the lotto safe, but Corr did not have a key.

Corr said that the store had three cash registers. Kinzer told Corr to open two of the registers and asked where the safe was located. Corr surmised that Kinzer did not mention the third register because he was "in a rush." Accordingly, some cash was left in the store, but Corr could not recall the amount. Corr said that he took Kinzer to the lotto safe because he feared he would be shot. He did not think about offering to open the third register. Kinzer took rolls of unactivated lottery tickets from the lotto safe. Corr said that to activate a lottery ticket, the "barcode" would have to be "scan[ned]" on the "lottery machine" and that scanning one barcode on a roll of tickets would activate the

entire roll. Corr did not recall how many rolls of lottery tickets were taken during the robbery.

Corr said that upon entering the main area of the store, Kinzer said, "'Come off of it,'" but did not "pinpoint anybody specifically." Corr put up his hands and told Kinzer he could have whatever he wanted. The Appellant "freaked out [and] . . . just acted crazy to me. He was acting unusual." Corr could not estimate how long Kinzer was in the store but noted that "[i]t felt like forever."

Corr said that the Appellant had been in the store a few times before the day of the robbery and that they knew each other well enough to have one another's telephone numbers. However, they never had spoken by telephone.

Corr said that after the robbery, the owner "felt weird" about him working at the store "until this whole situation was done," which effectively ended his employment.

Corr said that the owner allowed the employees to "run a tab" at the store and pay it after they were paid on Friday. Corr acknowledged that he told Detective Sanders he may have put something on his "tab" earlier that day because he did not have any cash with him.

Corr said that on the night of the robbery, the owner, Duggar, and he went to dinner at Applebee's. Before going to the restaurant, he went home to get his money, which was between five and twenty dollars. At the restaurant, the owner offered to pay for the dinner. Corr ordered alcoholic beverages and did not want the owner to think he was "freeload[ing]," so he offered to pay for his drinks even though he probably did not have enough money to cover the cost of his dinner and his drinks. Corr thought that if the owner complained about the cost of the drinks, he could tell him to deduct it from Corr's paycheck. The owner declined Corr's offer to pay for the drinks. Corr said that the owner told the police that Corr "pulled out a wad of money" at the restaurant. Corr said that the owner was lying, explaining that he would not have allowed the owner to pay for his dinner and drinks if he could have afforded to pay.

Corr acknowledged that at the time of trial, he was serving a sentence for aggravated burglary and theft. He conceded that he told the police, "'I could tell [Kinzer] wasn't trying to hurt me.'"

On redirect examination, Corr explained that he thought Kinzer was less likely to shoot him because Kinzer was disguised and that he might not be hurt if he cooperated. Corr recalled that the gun was a "long barrel revolver" that may have been silver.

Columbia Police Officer John McGlasson testified that he arrived at the store at 5:55 p.m. Officer McGlasson learned from Corr that the store had four security cameras and that the video from the cameras was transmitted to "kind of a D.V.R. box" in a small storage room at the back of the store. Corr took Officer McGlasson to the back room and showed him the security videos. Corr did not appear to be very familiar with the security system.

Officer McGlasson said that he watched the video from approximately ten minutes before the robbery until immediately after the robbery. The beginning of the video showed Corr working as the cashier and multiple people inside the store. The Appellant, a black male with red-tipped dreadlocks who was wearing a red shirt and blue jean shorts, came into the store and walked up and down the aisles while sending or receiving text messages from his cellular telephone. The Appellant approached Corr and spoke with him; however, with no audio, Officer McGlasson did not know what they said. After the conversation ended, the Appellant continued walking and using his telephone then exited the store. He returned a few minutes later, walked around inside the store, and sent or received text messages. The Appellant again approached Corr, and they talked. After the conversation, the Appellant walked through a "secondary door" to the back of the store where the bathroom was located. The Appellant went into the bathroom and closed the door. Ten or fifteen seconds later, the Appellant opened the bathroom door, stuck out his hand, and unlocked the store's back door, which was located near the bathroom door.

Officer McGlasson said that the video showed that after unlocking the back door, the Appellant withdrew his hand and closed the bathroom door. Approximately thirty seconds later, the Appellant left the bathroom and returned to the front of the store. He had another conversation with Corr then made a telephone call that lasted ten or fifteen seconds. The back door opened one or two minutes later, and Kinzer walked into the store. Officer McGlasson described Kinzer as a black male around six feet or six feet and two inches tall who was wearing a white t-shirt and a cap and with something over his mouth. Kinzer walked through the "secondary door," entered the main part of the store, and immediately approached Corr. The Appellant was the only other person in the store at that time. Kinzer pointed a pistol at Corr and appeared to make demands of him. Kinzer never pointed the gun at the Appellant. Nevertheless, as soon as Kinzer entered the main part of the store, the Appellant fell on the floor, "flailed," and threw his money and car keys on the floor. While Kinzer was interacting with Corr, the Appellant, who was lying on his side on the floor, reached up and locked the front door. Corr took money from the register and gave it to Kinzer. Kinzer turned to leave, then he turned around and grabbed the Appellant's keys from the floor and exited through the back door. After Kinzer left, Corr called the police. The Appellant remained on the floor for a minute, then he unlocked the front door and left the store.

Officer McGlasson estimated that the entire robbery took four minutes. He did not recall Kinzer making Corr leave the "cashier area." Officer McGlasson said that Kim Duggar, another store employee, was not present during the robbery. Officer McGlasson described the Appellant's behavior during the crime as "odd," explaining that he did not appear to have a reason for being in the store for as long as he was there. Officer McGlasson also said that the Appellant's reaction to Kinzer "seemed a little over done." From the video, Kinzer and the Appellant did not appear to have interacted inside the store. Additionally, the video showed nothing to indicate that Corr was involved in the robbery.

Officer McGlasson said that when Detective Knedson arrived, he wanted to watch the security videos. During an attempt to copy the video, Corr accidentally deleted it.

On cross-examination, Officer McGlasson said that Kinzer was wearing something white, possibly a shirt, over his face. He could not see whether Kinzer's mouth moved to indicate he was speaking.

Officer McGlasson said that after Kinzer picked up the Appellant's keys, he fled outside through the back door. The Appellant remained on the floor until he was sure Kinzer was gone then walked out the front door. Officer McGlasson could not be certain from the video whether the Appellant was initiating or receiving calls, but the video showed the Appellant talking into his cellular telephone before and after he went to the restroom. Officer McGlasson never saw the Appellant buy anything. Officer McGlasson said that Kinzer apparently took the Appellant's vehicle, which was found "a short time later."

Kimberly Dugger testified that in May 2012, she was a manager at the Tobacco and Beer Store and that Corr was a customer service representative at the store. She and Corr had dated and were friends.

Duggar said that she worked at the store on the morning of May 20, 2012, and that Corr relieved her that afternoon. Shortly after Dugger got home, Corr called and asked her to return and restock the lottery tickets. Dugger explained that the lottery tickets were kept in a separate room and that she had the only key. After Duggar arrived at the store, she went into the storage room, removed the lottery tickets, and activated them through the computer system. She stated that the tickets did not have any value until they were activated. After completing the task, Duggar and Corr smoked outside the store before Duggar went home.

Duggar said that while she was at the store, she saw a young black man and that Corr told her the man's name was "Money." The man was wearing a red t-shirt and had dreadlocks. He expressed interest in buying a carton of "roll-your-own" cigarettes. He

stayed at the counter area while Duggar and Corr were talking and seemed interested in their conversation, which Duggar thought was "unusual." Duggar asked the man to step aside so that she and Corr could talk privately, and he complied. Duggar did not recall whether the man was in the store when she arrived or whether he was still in the store when she left.

Duggar recalled that approximately ten or fifteen minutes after she left the store, she received a call informing her that the store had been robbed. She then returned to the store. She estimated that $1,500 to $2,000 in cash was taken from the store. Additionally, some lottery tickets were taken, but she did not know how many.

Duggar stated that the store's back door was locked. A key was needed to unlock the door from the outside but not from the inside.

On cross-examination, Duggar said that at the time of the robbery, three people worked at the store: the owner, Corr, and Duggar. Duggar had worked at the store for approximately six months. She acknowledged that the back door had been left unlocked occasionally, but it was accidental. Duggar knew about the store's security system but had no experience with it and did not have the password. She said that the owner had the password and that Corr may have known it. Duggar conceded that her employment was terminated not long after the robbery.

Duggar estimated that she left work around 1:00 p.m. on the day of the robbery. Corr called her to return to the store to refill the "scratch off" lottery tickets that were kept beside the register for sale. Duggar said that before she left work, she had not noticed the lottery tickets needed to be restocked.

Duggar could not say if the Appellant was the person whom Corr identified as "Money." She did not know anyone named "Spider" or anyone with a spider tattoo. She did not recall telling Detective Sanders about someone named "Spider."

Duggar said that the night of the robbery, Corr, the owner, and she went to dinner at Applebee's. She did not recall if Corr had any cash with him.

Duggar acknowledged that she had two convictions for the sale of cocaine and a felony theft conviction for stealing lottery tickets from the store. She acknowledged that the judgment of conviction reflected that the theft occurred on May 15, 2012, which was before the robbery in this case. Her employment at the store was terminated before she was charged with the May 15 theft. Duggar denied having any involvement in the robbery.

Amie Farris testified that she knew the Appellant because she occasionally babysat for his girlfriend. Around 6:40 or 6:45 p.m. on May 20, 2012, the Appellant called and said someone had stolen his truck. Farris picked the Appellant up at a Zip Mart at the corner of Highway 7 and North James Campbell Boulevard. He asked her to drive him to his residence on East 7th Street.

Farris said that during the drive to the Appellant's house, he called the police. She did not see anyone else at the house when she left the Appellant and did not notice whether he had keys to the house. Farris did not see the Appellant again that night.

Farris said that she was not familiar with the Tobacco and Beer Store and that she did not know about the robbery until someone told her about it later.

Columbia Police Detective Jason Sanders testified that on May 20, 2012, he interviewed the Appellant, and the interview was audio and video recorded. At the beginning of the interview, Detective Sanders read the Appellant his Miranda rights. The Appellant indicated his willingness to talk and signed the form waiving his Miranda rights. The Appellant acknowledged that he was in the store at the time of the robbery. Detective Sanders told the Appellant that his actions in the store that day were "suspicious." The Appellant denied any involvement in the planning or execution of the robbery. The Appellant told Detective Sanders that Kinzer had taken his vehicle. The Appellant explained that he called 911 to report his stolen vehicle after he was picked up by Farris. The Appellant said that he had walked and "hitched a ride" from the store to the Zip Mart.

Detective Sanders testified that at the time of the Appellant's statement, his vehicle had been recovered less than a mile from the Zip Mart on Sante Fe Pike. Detective Sanders noted that Kinzer lived on Nowlin Drive. The keys were not in the vehicle when it was recovered. The police searched the vehicle but found nothing significant. Thereafter, Detective Sanders "released" the vehicle to the Appellant's wife, who had keys for the vehicle. Detective Sanders asked her about the keys, and their conversation increased his suspicion of the Appellant.

Detective Sanders said that he and Sergeant Cox spoke with the Appellant the day after the robbery. The officers told the Appellant that they thought he was involved in the robbery because his reactions during the robbery were "overdramatized." The officers questioned the Appellant about his telephone usage while in the store. The Appellant said that while he was talking to Corr, he received a call from Kinzer, whose nickname was "K-Quay." Kinzer asked where the Appellant was, and the Appellant responded that he was at the Tobacco and Beer Store. Kinzer stated that he was going to get "a strap," meaning a firearm, and then rob the store. The Appellant told the officers that before the robbery, he and Kinzer occasionally spoke by telephone. The officers

showed the Appellant a photograph array and asked him to identify Kinzer. The Appellant became upset and started crying, explaining that he was afraid of Kinzer. The Appellant eventually identified Kinzer's photograph. The Appellant never suggested that Corr or Duggar were involved in the robbery.

Detective Sanders said that the Appellant denied unlocking the back door and locking the front door, but the security video showed the Appellant unlocking the back door and locking the front door. Detective Sanders opined that there was no reason other than participation in robbery to explain the Appellant's actions.

Detective Sanders spoke with Corr either the day of the robbery or the day after. He could not recall when the conversation occurred, but he thought it was after the second time he spoke with the Appellant. Detective Sanders spoke with Duggar after his second interview with the Appellant. Detective Sanders initially thought Corr and Duggar may have been involved in the robbery, but he found no evidence implicating them in the crime.

Detective Sanders said that on June 6, 2012, he spoke with the owner about Duggar's theft of lottery tickets from the store. Detective Sanders knew of no link between the robbery and Duggar's theft.

On cross-examination, Detective Sanders stated that the Appellant said Kinzer called while the Appellant was in the store and told the Appellant that he intended to rob the store. The Appellant told Kinzer, "'That's not a good idea,'" and hung up on him. Kinzer called again and said "that he was about to do this or something, something to that [e]ffect." Detective Sanders said that the Appellant

> told me that he had told Kinzer, yeah, that he didn't want it to happen and that he – I don't think it was a planned event between the two of them. It was just something that Mr. Kinzer called him and when he found out where he was at, that's – that what was going to – that's what he told me.

Detective Sanders said that the Appellant was afraid to identify Kinzer during the second interview because Kinzer had threatened the Appellant and his family after the first interview. Detective Sanders believed the Appellant's fear was genuine, noting that the Appellant cried and was visibly upset during the second interview.

Detective Sanders said that a black or mixed race female named Cassandra Kennedy tried to "cash" one of the unactivated lottery tickets at a Fast Stop in Dickson; however, the police were unable to locate her. Detective Sanders acknowledged that Kennedy was "in her late 20's," around the same age as Duggar.

Detective Sanders said that the day after the robbery, the owner came to the police station to report that approximately $900 worth of lottery tickets had been taken from the store. The previous day, the owner had reported that $300 worth of lottery tickets were missing. Detective Sanders observed that the owner's record keeping was poor; therefore, he did not think the owner was involved in the robbery but that he might be "trying to capitalize on the fact that his store had been robbed." Detective Sanders noted that the owner suspected Corr was involved in the robbery but did not suspect Duggar. The owner asked Detective Sanders about the deleted security video. To develop a rapport with the owner, Detective Sanders agreed that the deletion was suspicious. Nevertheless, Detective Sanders testified that he would have expected Corr to delete the video before showing it to the police if he were involved in the crime.

Detective Sanders said that he asked Dugger if Corr told her the name of the person he suspected and that Dugger responded, "Spider or Web." Corr did not mention either name when interviewed by the police. Detective Sanders did not recall any fingerprints being found on the back door.

Detective Sanders acknowledged that the indictment against Duggar stated that she stole lottery tickets from the store on May 15. He noted, however, that his report indicated that the theft occurred in June. Detective Sanders thought that Duggar had been taking lottery tickets from the store "here and there."

Brandon Schroeder testified that he was employed by the Columbia Police Department and was assigned to the Federal Bureau of Investigation's (FBI) Violent Crimes and Gangs Task Force. Officer Schroeder said that in August 2012, the FBI investigated a series of robberies in Middle Tennessee. During the investigation, Officer Schroeder and FBI Agent Brian Phasenbaker interviewed the Appellant on August 21, 2012, but the interview was not recorded. The Appellant acknowledged that his nickname was "Money." He said that he knew Corr, that Corr had previously given him a discount on cigarettes, and that the Appellant supplied Corr with marijuana obtained from Kinzer. The Appellant acknowledged that he and Kinzer were in the Tobacco and Beer Store together on only one occasion and that it was shortly before the day of the robbery.

The Appellant told Officer Schroeder that on the day of the robbery, Kinzer called and asked about the Appellant's "homeboy" who worked at the store. He was referring to Corr. Kinzer also asked the Appellant to estimate how much money was in the store, and the Appellant responded that he could not estimate the amount. Kinzer told the Appellant that he intended to rob the store and that he would enter the store through the back door. The Appellant acknowledged that he used the restroom and that while he was in the back of the store, he unlocked the door to allow Kinzer entry.

The Appellant told Officer Schroeder that Kinzer came into the front of the store and took Corr to the back of the store and inquired about the safe. The Appellant did not know the amount of money that was taken from the store. After Kizer left the store, Corr told the Appellant to leave. The Appellant left the store, walked toward the Jackson Manor Apartments, and called the police. Kinzer called later and said that the Appellant's vehicle was parked at Nowlin Court. A friend of the Appellant's wife drove him to get his vehicle.

The Appellant said that he unlocked the back door but did not want to be part of the robbery. He acknowledged that he and Kinzer "hung out." The Appellant did not indicate that anyone other than Kinzer was involved in the robbery.

On cross-examination, Officer Schroeder said that he interviewed the Appellant to obtain information about other robberies; however, the interview turned to the robbery of the Tobacco and Beer Store, for which the Appellant had already been charged. Officer Schroeder told the Appellant that he would inform the State of any assistance the Appellant provided. The Appellant told Officer Schroeder that he "felt used by Kinzer." Officer Schroeder said that the Tennessee Bureau of Investigation (TBI) examined the store's security equipment but was unable to retrieve the missing footage.

After the State rested its case-in-chief, the Appellant chose not to put on any proof. Based upon the foregoing evidence, the jury found the Appellant guilty of facilitation of aggravated robbery. The trial court sentenced the Appellant as a Range III, persistent offender to twelve years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a).

The Appellant makes three specific complaints regarding the sufficiency of the evidence. First, he contends that Corr, who was the victim listed on the indictment, was involved in the robbery. The Appellant argues that he could not have facilitated the robbery of Corr if Corr was involved in the robbery. In support of this contention, the Appellant notes that Corr had been convicted of aggravated robbery and theft, that he was initially a suspect, that he deleted the security video of the robbery, and that he had no money earlier that day but had some money later that night when the owner, Duggar, and he went to dinner. We note that at trial, Corr explained that the deletion of the security video was accidental. He said that the owner allowed them to have a "tab" and that he put items on his "tab" earlier that day, explaining that the employees rarely took much money to the store. He acknowledged that he had money at the restaurant but explained that it was only a small amount. Moreover, the officers who testified asserted that they found no evidence that Corr was involved in the robbery, Corr denied any involvement in the crime, and the Appellant never implicated Corr when speaking with the authorities. The jury, as the trier of fact, obviously believed that Corr was not involved in the robbery. As our supreme court has stated, "The jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof." State v. Echols, 382 S.W.3d 266, 282 (Tenn. 2012). We will not revisit the jury's assessment of the facts.

Next, the Appellant notes that an aggravated robbery is committed in pertinent part by "putting [a] person in fear" and contends that Corr was not in fear. He cites Corr's statement to Detective Sanders that he "'could tell [Kinzer] wasn't trying to hurt [him].'" At trial, Corr explained that he thought the likelihood of his being shot was lessened because Kinzer was wearing a mask during the robbery. Despite his perception of the reduced risk of being shot, Corr asserted that he was afraid during the robbery. The jury obviously accredited Corr's trial testimony. Generally, determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

Finally, the Appellant contends that he denied any involvement in the robbery and maintains that he was scared of Kinzer and told Kinzer not to rob the store. In the light most favorable to the State, the proof adduced at trial reveals that the Appellant went into the Tobacco and Beer Store and wandered around while repeatedly using his cellular telephone for calls or text messages; at least some of the calls and/or messages were with Kinzer. Kinzer told the Appellant of his plans to rob the store and that he intended to enter the store through the back door. The Appellant was given permission to use the store's restroom, which was in the back of the store. When the Appellant went to the restroom, he unlocked the back door, which allowed Kinzer to enter the store. After the Appellant returned to the front of the store, Kinzer entered through the back door with a shirt tied over the bottom of his face and a handgun. Kinzer pointed the gun at Corr and demanded money. Corr opened two registers, and Kinzer took the cash. Kinzer demanded the location of the safe, and Corr led Kinzer to the office in the back area of the store. From the "lotto safe," Kinzer took some unactivated lottery tickets before he and Corr returned to the front of the store. During the robbery, the Appellant locked the front door, preventing Corr from easily leaving and stopping anyone else from entering the store. Although Kinzer never threatened the Appellant, the Appellant screamed, fell to the floor, and threw his wallet, cellular telephone, and car keys on the floor, effectively providing Kinzer with a means of escape. Kinzer took the Appellant's car keys and left the store. Afterward, Corr told the Appellant to leave. Corr estimated that the robber took between $1,500 and $2,500 in cash from the store. We conclude that a rational trier of fact could have found the Appellant guilty of facilitating the aggravated robbery of Corr beyond a reasonable doubt.

## III.  Conclusion

Finding no error, we affirm the judgment of the trial court.


              _____

NORMA MCGEE OGLE, JUDGE